## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| Ryan DuBoise, | | : | |
| | Petitioner | : | |
| | | : | |
| v. | | : | |
| | | : | |
| Bob Rumcik, | | : | No. 566 M.D. 2020 |
| | Respondent | : | Submitted: January 21, 2022 |

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE COVEY                                          FILED:  June 7, 2022

Before this Court is Ryan DuBoise's (DuBoise) Application for Summary Relief (Application) seeking judgment in his favor and against State Correctional Institution at Forest's (SCI-Forest) Medical Records Custodian, Bob Rumcik (Rumcik), who is represented by the Pennsylvania Department of Corrections (collectively, DOC).  After review, this Court denies the Application.

### Background[1]

DuBoise is an inmate at SCI-Forest.  On May 9, 2020, DuBoise submitted an Inmate Request to Staff Member (Request) to Rumcik, together with a DC-108 Authorization for Release of Information form (Form DC-108), to obtain his mental health treatment records for the period from July 1, 2017 to December 20, 2018, "regarding all aspects of treatment, sessions, etc.[,] . . . for litigation and

---

[1] All facts are as alleged in the pleadings.

personal file keeping."[2]  DOC New Matter Ex. A at 2; *see also* DOC Ans. ¶¶ 5-6; DOC New Matter Ex. A at 1.  On May 12, 2020, Rumcik denied DuBoise's Request, stating: "Per policy, you cannot have copies of your mental health records.  They can only be discussed with the psychiatrist/psychologist."  DOC Ans. ¶ 6.

On October 6, 2020, DuBoise filed a *pro se* Petition for Review in the nature of a complaint in mandamus (Petition), wherein he claimed that DOC violated his statutory rights to obtain his mental health treatment records under Section 6155(b)(1) of the act commonly referred to as the Medical Records Act (MRA)[3] and Section 111 of the Mental Health Procedures Act (MHPA),[4] and requested this Court to compel DOC to release the records to him.

On November 6, 2020, DOC filed Preliminary Objections to the Petition, arguing that DuBoise has no clear right to relief, and the Petition should be dismissed because: (1) a correctional medical facility is not a health care facility, as defined in the Health Care Facilities Act (HCFA),[5] to which the MRA applies (First Preliminary Objection); and (2) DuBoise's treatment was not rendered at a mental health facility governed by the MHPA (Second Preliminary Objection).  On November 30, 2020, DuBoise filed an Answer opposing DOC's Preliminary Objections.

On May 21, 2021, this Court sustained DOC's Second Preliminary Objection, overruled DOC's First Preliminary Objection because it did not appear with certainty that DuBoise could not succeed in his mandamus challenge under the

---

[2] DOC asserted and DuBoise admitted: "[Form] DC-108 [] provides a mechanism by which prisoners can release their records to outside individuals [for various purposes]."  DOC New Matter ¶ 5; *see also* DOC New Matter Ex. B at 3-12 - 3-13.

[3] 42 Pa.C.S. § 6155(b)(1) (relating to patient rights to records).

[4] Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. § 7111 (relating to record confidentiality).

DuBoise also relies on *Christy v. Wordsworth-at-Shawnee*, 749 A.2d 557 (Pa. Cmwlth. 2000), to support that DOC violated his statutory rights.

[5] Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§ 448.101-448.904b.

MRA, and ordered DOC to answer the allegations in DuBoise's Petition relating to the MRA. *See DuBoise v. Rumcik* (Pa. Cmwlth. No. 566 M.D. 2020, filed May 21, 2021) (*DuBoise I*), slip. op. at 4-8.

On June 16, 2021, DOC filed an Answer and New Matter to DuBoise's Petition. Relevant to the Application, DOC asserted in New Matter that Section 3.B.7.d.(1)-(2) of the DC-ADM 003, Release of Information Procedures Manual (Manual), generally prohibits inmates from having copies of their mental health treatment records (Policy), unless the records are obtained through the discovery process in pending pro se litigation. *See* DOC New Matter ¶¶ 7, 11; *see also* DOC New Matter Ex. B at 3-12 - 3-13. DOC added that "a prisoner is permitted to review and discuss his mental health treatment and the contents of his [] record with mental health staff, upon request." DOC New Matter ¶ 10; *see also* DOC New Matter Ex. B at 3-12.

In addition, DOC recited that the MRA imposes a duty on medical care providers, like hospitals, to timely produce medical records upon receipt of a subpoena for use in litigation. *See* DOC New Matter ¶ 13. DOC added:

> 15. . . . [T]he MRA itself provides no statutory remedies or private causes of action for alleged violations of the [MRA], and so [DuBoise] has failed to state a claim upon which relief can be granted.
>
> 16. Neither [DOC] nor SCI-Forest is a "health care provider" or a "health care facility" as contemplated by the MRA, and so [DuBoise] has failed to state a claim upon which relief can be granted.
>
> 17. [DuBoise] did not make his [R]equest to obtain his mental health records for a proper purpose under the MRA; that is, [DuBoise] did not subpoena his mental health records for use in [pro se] litigation as contemplated by the MRA.

3

DOC New Matter ¶¶ 15-17. DOC further contended, *inter alia*, that Rumcik did not deprive DuBoise of any rights, privileges, or immunities secured to him by the United States (U.S.) or Pennsylvania Constitutions or federal or state law.[6] *See* DOC New Matter ¶¶ 22-23, 25-26. DOC maintained that the Policy "reflects [DOC's] legitimate penological interest in maintaining safe and effective treatment relationships between mental health staff, including psychologists, psychiatrists and other clinicians, and prisoners[,]" DOC New Matter ¶ 8, and "avoid[s] the damage that could occur to the treatment relationship should an inmate have access to the candid notes and impressions of mental health staff." DOC New Matter ¶ 9.

On July 6, 2021, DuBoise filed his Response to DOC's New Matter. Therein, DuBoise acknowledged DOC's Policy, and that the Policy allows inmates to review and discuss their treatment with mental health staff upon request, but asserted that it violates his statutory right under the MRA, and his constitutional right to equal protection. *See* DuBoise Resp. to New Matter ¶¶ 7-8, 10-11, 22-23, 25-26. DuBoise declared that he is no longer being treated by mental health staff, and DOC has not afforded him the opportunity to discuss his treatment records with staff.[7] *See* DuBoise Resp. to New Matter ¶ 10. DuBoise also admitted that he is not engaged in ongoing pro se litigation. *See* DuBoise Resp. to New Matter ¶¶ 11-12. In addition, DuBoise retorted that DOC cannot apply its penological interest wholesale but, rather, must review it on a case-by-case basis and present credible evidence thereof. *See* DuBoise Resp. to New Matter ¶ 9. DuBoise denied that the MRA does not afford him a statutory remedy, that DOC is not a healthcare facility subject to the

---

[6] DOC's New Matter included a lengthy list of other general defenses not relevant to this Court's analysis of the Application, all of which DuBoise denied. *See* DOC New Matter ¶¶ 19-22, 24, 27; *see also* DuBoise Resp. to New Matter ¶¶ 19-22, 24, 27.

[7] However, DuBoise did not aver in the pleadings that he made a request to discuss his mental health treatment with staff.

4

MRA, and that the MRA required him to subpoena his records. *See* DuBoise Resp. to New Matter ¶¶ 15-18.

On September 7, 2021, after the pleadings were closed, DuBoise filed the Application, seeking judgment on the pleadings in his favor and against Rumcik. On September 21, 2021, DOC opposed the Application. The Application is now ripe for review.

**Discussion**

Initially, Pennsylvania Rule of Appellate Procedure 1532 provides that, "similar to the type of relief envisioned by the Pennsylvania Rules of Civil Procedure regarding judgment on the pleadings[,]" Pa.R.A.P. 1532(b), note, "[a]t any time after the filing of a petition for review in an . . . original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). This Court has expounded:

> A motion for judgment on the pleadings is in the nature of a demurrer; all of the opposing party's allegations are viewed as true and only those facts which have been specifically admitted by him may be considered against him. In reviewing a motion for judgment on the pleadings, the [] court may only consider the pleadings themselves and any documents properly attached thereto. **A motion for judgment on the pleadings should be granted by a [] court only when the pleadings show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law**.

*Trib Total Media, Inc. v. Highlands Sch. Dist.*, 3 A.3d 695, 698 n.2 (Pa. Cmwlth. 2010) (emphasis added; citations omitted). "[T]he burden is on the moving party to prove the non-existence of any genuine issue of fact[,] and . . . all doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party." *Lyman v. Boonin*, 635 A.2d 1029, 1032 (Pa. 1993).

5

### 1. MRA

DuBoise argues that this Court should grant the Application because he has a clear statutory right to obtain his own mental health treatment records pursuant to the MRA, DOC's Policy is arbitrary, irrational, and unconstitutional, and there are no material facts in dispute. DOC responds that this Court should deny the Application because the pleadings fail to establish that DuBoise is entitled to the requested relief, and there are genuine issues of material fact; namely, whether the MRA applies to DOC and, if so, whether it requires DOC to allow DuBoise to possess his medical records despite the legitimate penological interest protected by the Policy.

As DOC acknowledges, this Court's decision on the Application turns upon the MRA and DOC's Policy. "As with all questions of statutory interpretation, this case presents a pure question of *law* . . . ." *Whalen v. Pub. Sch. Emps. Ret. Bd.*, 265 A.3d 570, 574 (Pa. 2021) (emphasis added). DOC has not specified any other outstanding genuine issue of material fact that would prevent this Court from granting the Application. Accordingly, this Court will proceed to determine whether DuBoise has a clear legal right to obtain and possess his mental health records under the MRA and DOC's Policy.

In *DuBoise I*, this Court overruled DOC's First Preliminary Objection on the basis that it could not declare with certainty that the law would not permit DuBoise to succeed in his mandamus challenge under the MRA. After review of the MRA and the HFCA, the *DuBoise I* Court concluded that, in the absence of a contrary DOC policy, DuBoise appeared to have a right to obtain and possess his mental health treatment records under the MRA.

6

## 2. Policy

However, DOC raised in its Answer and New Matter that, notwithstanding the MRA, the Policy in Section 3.B.7.d of the Manual prevented Rumcik from granting DuBoise's Request.

Section 3.B.7.d of the Manual specifies, in relevant part:

> Mental health information consists of both: (1) information learned from an inmate by a psychiatrist or psychologist during a counseling session in which the psychologist was acting as the inmate's mental health therapist, and (2) information pertaining to medical treatment offered, recommended or furnished to an inmate for treatment of a mental health condition (information indicating that the inmate is taking antidepressant medication).
>
> (1) **An inmate is permitted to discuss his/her general mental health treatment with members of the health care treatment staff**. A [Form] DC-108 is not required for such discussions.[8] **An inmate generally will not be permitted to receive a copy of records pertaining to his/her mental health treatment**. Except as discussed below, a [Form] DC-108 signed by the inmate . . . must be obtained prior to releasing mental health treatment information.
>
> (2) An inmate may not possess the original of his/her mental health treatment records. **An inmate that is**

---

[8] Section VI of the DC-ADM 003 Release of Information Policy Statement (DC-ADM 003 Policy Statement) adds that the DC-ADM 003 "does not create rights in any person." DC-ADM 003 Policy Statement at 11, www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/003%20Release%20of%20Inform ation.pdf (last visited May 17, 2022); *see also Cabral v. Beard* (Pa. Cmwlth. No. 622 M.D. 2010, filed Apr. 14, 2011), slip op. at 6 ("DC-ADM 003 does not establish any right for an inmate to possess copies of his medical records in his cell."). Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported panel decision of this Court issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent. *Cabral* and the other unreported cases cited herein are cited for their persuasive value.

**representing himself/herself in actual litigation is permitted to obtain a copy of records pertaining to his/her mental health treatment through the discovery process**. Requests for copies of mental health treatment records in connection with litigation must be referred to the attorney representing [DOC] in the litigation or, if there is no such attorney, to the Office of Chief Counsel, Legal Assistance Center.

(3) A copy of mental health treatment records will be disseminated to a person or organization designated in a [Form] DC-108 signed by the inmate, including persons representing the inmate in litigation, except that mental health treatment records pertaining to one inmate may not be disseminated to another inmate.

DOC New Matter Ex. B at 3-12 (emphasis omitted; emphasis added).

Because DuBoise has not filed pro se litigation that implicates his mental health treatment and/or his mental health treatment records, the Policy prohibits him from obtaining and possessing those records. DuBoise contends that the Policy violates his constitutional right to equal protection, and is arbitrary and irrational because he is not undergoing mental health treatment.

"It is well-established that prison administrators must be afforded wide-ranging deference in adopting and carrying out policies that in their reasonable judgment are necessary to preserve order, discipline, and security." *DeHart v. Horn*, 694 A.2d 16, 19 n.9 (Pa. Cmwlth. 1997). Notwithstanding, DOC's policy-making authority is not unfettered. This Court has explained:

We apply a two-step approach in assessing [an inmate's] constitutional challenge. *See Brown* [*v. Dep't of Corr.*], 932 A.2d [316,] 318 [(Pa. Cmwlth. 2007)]. First, we must determine whether the [DOC p]olicy infringes upon any of [the inmate's] constitutional rights. If we answer that question in the affirmative, the second step is to determine whether the policy is nonetheless reasonable - i.e., whether it is "reasonably related to legitimate penological interests." *Brittain v. Beard*, . . . 974 A.2d 479 ([Pa.] 2009) (*Brittain*) (citing *Turner v. Safley*, 482 U.S. 78 . . . (1987)).

8

In the second step of our analysis, we consider the following factors:

(1) whether there is a "valid, rational connection" between the prison [policy] and the legitimate governmental interest asserted to justify it; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the asserted constitutional right will have on guards, inmates, and prison resources; and[] (4) whether there are "ready alternatives" to the rule that would accommodate prisoners' rights at *de minim*[*i*]*s* cost to penological interests.

[*Brittain*], 974 A.2d at 486. With respect to these factors (known generally as the "*Turner* [F]actors"), the [U.S.] Court of Appeals for the Third Circuit has explained:

These requirements "serve as guides to a single reasonableness standard," but the first [factor] "'looms especially large' because it 'tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions.'"

*Ramirez v. Pugh*, 379 F.3d 122, 126 (3d Cir. 2004) (quoting *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999)). In assessing these factors, the courts give substantial deference to the professional judgment of prison administrators. *Brittain*, . . . 974 A.2d at 486. "[O]nce an inmate commences an action challenging a prison [policy], it is the obligation of [DOC] to set forth, in its answer to the inmate's complaint, its *belief* that there is a valid and rational connection between the challenged [policy] and an enumerated legitimate penological interest." *Id*. at . . . 487 (emphasis added). The burden then shifts to the inmate to prove the *unreasonableness* of DOC's *belief. Id*. at . . . 487-88 (emphasis added).

*Bussinger v. Dep't of Corr.*, 29 A.3d 79, 83-84 (Pa. Cmwlth. 2011) (italic emphasis omitted), *aff'd sub nom. Bussinger v. Pa. Dep't of Corr.*, 65 A.3d 289 (Pa. 2013).

In the instant matter, DOC asserted "its *belief* that there is a valid and rational connection between the [Policy] and an enumerated legitimate penological interest," *Bussinger*, 29 A.3d at 84 (quoting *Brittain*, 974 A.2d at 487), so this Court

must determine if the Policy infringed upon any of DuBoise's constitutional rights. *See Turner*; *Brittain*.

### a. Constitutional Right

DuBoise expounds in his brief that, since the MRA does not limit non-prisoners from accessing their own medical records, the Policy represents "invidious discrimination against prisoners" in violation of the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment. DuBoise Br. at 12.

Section 1 of the Fourteenth Amendment to the U.S. Constitution provides, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Article 1, section 26 of the Pennsylvania Constitution declares: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Const. art. I, § 26. "Together, [article 1, section 1 and article 1, section 26 of the Pennsylvania Constitution] are understood to establish a right to equal protection of the laws equivalent to that established in the [U.S.] Constitution."[9] *Smires v. O'Shell*, 126 A.3d 383, 393 n.7 (Pa. Cmwlth. 2015), *as amended* (Oct. 26, 2015). "[The Pennsylvania] Supreme Court has held that '[t]he Equal Protection Clause . . . does not obligate the government to treat all persons identically, but merely assures that all similarly[-]situated persons are treated alike.'" *Garrison v. Dep't of Corr.*, 16 A.3d 560, 564 (Pa. Cmwlth. 2011) (quoting *Small v. Horn*, 722 A.2d 664, 672

---

[9] Accordingly, "[the Pennsylvania] Supreme Court has held that the equal protection provisions of the Pennsylvania Constitution are analyzed under the same standards used by the [U.S.] Supreme Court when reviewing equal protection[] claims under the Fourteenth Amendment to the [U.S.] Constitution." *Muscarella v. Commonwealth*, 87 A.3d 966, 972 n.8 (Pa. Cmwlth. 2014).

(Pa. 1998)). Further, "prisoners do not shed all constitutional rights at the prison gate[.]" *Sandin v. Conner*, 515 U.S. 472, 485 (1995).

Having determined that the Policy limits the MRA's application to DuBoise based on his inmate status, thereby implicating his constitutional right to equal protection under the law, this Court must now apply the *Turner* Factors to assess whether the Policy "is nonetheless reasonable - i.e., whether it is 'reasonably related to legitimate penological interests.'" *Bussinger*, 29 A.3d at 83 (quoting *Brittain*, 974 A.2d at 486) (italic emphasis omitted).

### b. Reasonableness (*Turner* Factors)

Although inmates do not relinquish all of their constitutional rights upon incarceration,

> [p]rison inmates do not enjoy the same level of constitutional protections afforded to non-incarcerated citizens. As the *Robson* [*v. Biester*, 420 A.2d 9 (Pa. Cmwlth. 1980) C]ourt observed, "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." [*Id*.] at 13 (citing *Price v. Johnston*, 334 U.S. 266 . . . (1948)).

*Bronson v. Cent. Off. Rev. Comm.*, 721 A.2d 357, 359 (Pa. 1998). Thus, the U.S. Supreme Court has ruled that "when a prison [policy] impinges on inmates' constitutional rights, the [policy] is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Accordingly, the first *Turner* Factor requires this Court to determine "whether there is a 'valid, rational connection' between the [Policy] and the legitimate governmental interest asserted to justify it[.]" *Bussinger*, 29 A.3d at 84 (quoting *Brittain*, 974 A.2d at 486). "[DOC's] burden here is not high. [DOC] need only set forth [its] '*belief* that there is a *valid and rational connection* between the

11

[Policy] and an *enumerated legitimate penological interest*.'" *Id*. at 84 (quoting *Brittain*, 974 A.2d at 487). The *Bussinger* Court expounded:

> The question under the first prong of *Turner*, . . . is not whether DOC has a purpose behind the [c]hallenged [p]olicy, or even whether the [c]hallenged [p]olicy is effective. Instead, the question is whether the [c]hallenged [p]olicy has a valid and rational connection to a "legitimate *penological* interest." **It is this connection to an interest unique to our prison system that justifies the substantial deference we afford DOC** in these types of cases:
>
> > We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.
>
> *Overton v. Bazzetta*, 539 U.S. 126, 132, . . . (2003).

*Bussinger*, 29 A.3d at 86 (emphasis added).

> [C]ourts have recognized legitimate penological interests in (a) maintaining internal security for the protection of prison employers, prisoners, and visitors; (b) deterring the use of drugs and alcohol in prisons; (c) preventing future crime; (d) the rehabilitation of inmates; (e) fair and appropriate treatment among inmates; (f) curbing sexually-offensive behavior in the prison; and (g) controlling/eliminating the flow of contraband into prisons.

*Id*. at 87; *see also Pell v. Procunier*, 417 U.S. 817 (1974).

Here, DOC's enumerated penological interest is in protecting mental health treatment relationships so as to provide inmates with the best possible treatment, insure staff safety, and maintain security, all of which is unique to a correctional institution setting. *See* DOC New Matter ¶¶ 8-9. DuBoise responded that the Policy should be applied on a case-by-case basis, and an exception should

12

be made when the inmate is no longer seeking mental health treatment. *See* DuBoise Resp. to New Matter at 2.

However, DOC reiterates its long-standing position that allowing an inmate to obtain and possess his mental health treatment records constitutes a valid threat to ongoing relationships with treatment staff and related evaluation efficacy which, even after treatment has ended, would leave decision-makers without the benefit of accurate professional observations necessary to make current and future placements and, ultimately, release the inmate from custody.[10] DOC has a clear

---

[10] This Court observes that federal courts have historically refused to compel DOC to produce mental health treatment records to inmates in an effort to protect its stated penological interest. *See Mercaldo v. Wetzel* (M.D. Pa. No. 1:13-CV-1139, filed Oct. 6, 2016) (wherein the inmate was not under the care of mental health providers and his lawsuit did not implicate his mental health treatment, the U.S. District Court refused to compel DOC to produce the inmate's mental health records, relying on DOC's concern that "release of an inmate's mental[] health records would reveal to the inmate candid evaluations of the inmate by professionals - information that [DOC] guards carefully [] avoid revealing . . . to inmates, who could use the information to help them manipulate future evaluations, and could undermine [DOC's] interest in providing adequate mental[] health treatment to inmates"), 2016 WL 5851958, at *6; *Spencer v. Collins* (M.D. Pa. No. 3:12-CV-00616, filed Sept. 12, 2013) (wherein the court declined to order DOC to produce an inmate's mental health records, not only because his lawsuit did not challenge his mental health treatment, but based on DOC's position that releasing them would affect institutional safety and security, in that "the release of [such] records to inmates will expose mental health treatment staff to possible retaliation by the inmates, and additionally may compromise the treatment process"), 2013 WL 5176747, at *2; and *Banks v. Beard* (M.D. Pa. No. 3:CV-10-1480, filed July 17, 2013) (wherein the court refused to order DOC to disclose an inmate's mental health treatment records because the lawsuit implicated only his mental health *diagnoses* (which DOC could stipulate to), recognizing that "were [mental health records] made available to inmates or the public, DOC professionals would tend to refrain from entering candid opinions and evaluations[, so] . . . decision-makers would not have the benefit of honest observations . . . [; and], if an inmate knows how DOC staff will evaluate him and how particular behaviors are likely to be interpreted, he is capable of manipulating the resulting determination, which could lead to inaccurate assessments, improper institutional placements, and possible premature release from custody" (quotation marks and internal record citations omitted)), 2013 WL 3773837, at *3.

This Court acknowledges: "'Generally, decisions of federal district courts and courts of appeals are not binding on this Court, . . . but they may have persuasive value.' Unreported federal court decisions may also have persuasive value." *O'Toole v. Pa. Dep't of Corr.*, 196 A.3d 260, 271 n.15 (Pa. Cmwlth. 2018) (quoting *Nagle v. TrueBlue, Inc.*, 148 A.3d 946, 959 n.15 (Pa. Cmwlth. 2016)). This Court relies on the federal cases cited herein for their persuasive value.

13

interest in ensuring that inmates receive adequate and meaningful mental health treatment upon which decision-makers can rely.[11] Denying inmate access to candid mental health opinions and evaluations, and thereby protecting inmate relationships with treatment staff, represents a valid and rational way to protect that penological interest. Thus, "[i]t is . . . an interest unique to our prison system that justifies the substantial deference we afford DOC in these types of cases[.]" *Bussinger*, 29 A.3d at 86. Accordingly, this Court concludes that DOC has satisfactorily enumerated a legitimate penological interest for the Policy.

The second *Turner* Factor calls upon this Court to look at "whether alternative means are open to inmates to exercise the asserted right[.]" *Bussinger*, 29 A.3d at 84 (quoting *Brittain*, 974 A.2d 486). In this case, the Policy not only allows inmates to obtain their mental health treatment records when the records are at issue and properly obtained during discovery in pro se litigation, but, in the absence of ongoing pro se litigation, inmates may discuss their mental health treatment with staff. *See* Policy, Section 3.B.7.d of the Manual.

The third *Turner* Factor requires this Court to consider the impact that allowing inmates to obtain and possess their mental health treatment records would have on guards, inmates, and prison resources. *See Brittain*; *Bussinger*. The threat to mental health treatment staff and their relationships with inmates if inmates are permitted to know their candid opinions and evaluations is the enumerated basis for DOC's Policy. It is also reasonable to conclude that guards and other inmates would

---

[11] Even the MRA anticipated circumstances in which medical record access could or should be restricted or denied. Section 6155(a) of the MRA states: "[T]he health care facility having custody of the charts or records shall have standing to apply to the court . . . for a protective order denying, restricting or otherwise limiting access to and use of the copies or original charts and records." 42 Pa.C.S. § 6155(a).

be impacted if staff cannot honestly record their assessments and misdiagnoses lead to erroneous institutional placement.

Pursuant to the fourth *Turner* Factor, this Court must evaluate whether there are ready alternatives to the Policy that would accommodate inmates' rights at *de minimis* cost to penological interests. *See Brittain*; *Bussinger*. The *Bussinger* Court explained:

> [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Bussinger*, 29 A.3d at 92 (quoting *Turner*, 482 U.S. at 90).

DuBoise's suggestion that a ready alternative would be for DOC to modify the Policy with an exception for inmates not currently undergoing mental health treatment lacks merit because it is reasonable to conclude that, as long as an inmate remains a DOC inmate, the potential that he may need to undergo future psychological evaluation or treatment, and/or that DOC staff may need to rely on his mental health treatment records, is ongoing. Thus, DOC's legitimate penological interest in maintaining safe and effective treatment relationships continues to exist, and the fact that an inmate may no longer be undergoing mental health treatment is immaterial. Accordingly, there are no ready alternatives to the Policy that would accommodate prisoners' rights at *de minimis* cost to penological interests.

Having determined that DOC has a legitimate penological interest in the Policy's prohibition on inmates possessing their mental health treatment records, and since DuBoise did not present sufficient justification in the pleadings to disprove the Policy's validity, *see Bussinger*; *Brittain*, this Court concludes that the Policy does not unreasonably infringe on DuBoise's equal protection rights. Because the Policy satisfies the two-step constitutional analysis, *see Bussinger*, DuBoise is not "entitled to judgment as a matter of law" on the basis that the Policy violates his constitutional right to equal protection. *Trib Total Media, Inc.*, 3 A.3d at 698 n.2. Accordingly, the Application must be denied.

## Conclusion

For all of the above reasons, the Application is denied.

_____

ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ryan DuBoise,                          :
        Petitioner             :
                               :
        v.                       :
                               
Bob Rumcik,                            :   No. 566 M.D. 2020
        Respondent            :

## O R D E R

AND NOW, this 7th day of June, 2022, Ryan DuBoise's Application for Summary Relief is DENIED.

_____
ANNE E. COVEY, Judge